HOBSON, Judge.
Plaintiff-appellant brings this timely filed appeal from an order granting a motion for new trial on the issue of damages. The plaintiff sustained injuries as a result of the defendant’s ambulance colliding into the rear of the plaintiff’s car. After a full presentation of the evidence, which consisted largely of detailed medical testimony concerning the past, present and future physical condition of the plaitiff, the jury on December 14, 1966 returned a judgment for the plaintiff in the sum of $38,000.
*258 The trial judge granted a new trial on the question of damages only, stating:
“1. That by no reasonable view of the evidence, construed most favorably to the plaintiff, can the amount of damages in the verdict be said to comport with the manifest weight of the evidence adduced at the trial of this cause.
“2. That after presiding over the entire trial seeing and listening to all of the persons who testified, reviewing the evidence, relating to damages, all- in a view construed best to the interests of the plaintiff, the amount of damages in this verdict shocked the conscience of this Court.”
The order appealed from may be reviewed by this court on the record for the purpose of ascertaining whether the exercise of judicial discretion implicit in the order has been abused and if it is apparent from the record that such discretion has been abused, it is the duty of this court to set aside the order of the trial judge granting the new trial. Russo v. Clark, Fla.1962, 147 So.2d 1.
The judge also stated in his order granting a new trial, “there was no testimony of need of future medical treatment and no testimony on which this court felt it could instruct on loss of earning capacity and no such instructions voere given.” (emphasis ours)
It is true that the able trial judge did not give instructions on future medical treatment and loss of future earning capacity. It is also true that counsel for the plaintiff failed to object to the judge’s refusal to so instruct on these elements of damage.
After carefully reviewing the record in this case, we find that the trial judge did not abuse his discretion in view of the fact that the jury, under the instructions as given them by the trial judge, could not take into consideration, in awarding damages to the plaintiff, loss of future earning capacity.
We cannot consider for reversal on this appeal the correctness of the trial judge’s refusal to instruct the jury on the loss of plaintiff’s future earning capacity, as no objection to such refusal was made.
However, in view of the fact that a new trial on the issue of damages only will be had herein, we hold that the testimony adduced at the trial of this cause would require an instruction on loss of future earning capacity. Dr. Moore, a qualified orthopedic surgeon, testified as follows:
“Q Are the complaints which she has given to you, and your findings on X-ray examination, are they painful in your experience ?
A They are painful in the experience of patients that I have seen, yes.
Q Doctor, do you have an opinion you can express with reasonable medical certainty as to whether Mary Burris will, in the future, continue to suffer pain as a result of her injuries ?
A Yes, she will.
* * * =t= * *
Q Doctor, can you say with reasonable medical certainty whether Mary Burris will have any permanent dis-bility as a result of her injuries?
A Yes.
Q What, sir?
A She will. She does. And she has.
Q Can you give us the benefit of any percentage in disability that she is going to have permanently ?

A I would say that she has at least 20 percent incapacity from this injury.
* * * * * *
*259 Q Now, you mentioned awhile ago you would expect her to have some pain in the future. I take it you would have no way of projecting how far in the future this pain would continue ?
A She will have it the rest of her life if she exerts even to a moderate degree in the form of lifting, stooping, repeated bending, and so forth.”
In addition to Dr. Moore’s testimony, the plaintiff testified concerning her employment prior to her injuries resulting from the accident herein involved, as follows:
“Q When did you first go out, and with whom did you first get a job outside of the home?
A Ocean Prgducts.
Q And how long did you work at Ocean Products ?
A Five years.
Q And what were you doing at Ocean Products, Mary?
A I packed shrimp in the boxes, and I ■ laid it on trays which you lay on trays with your hands. You lay shrimp on the trays, and I weighed the shrimp on — it was a scale like.
Q I see. And you worked at Ocean Products doing that for approximately 5 years?
A Yes.
Q Did you enjoy your job?
A Yes.
Q Now, did you change jobs from Ocean Products to.somewhere else?
A Yes, to Shoreline.
Q Why?
A I wanted to go to work there because Ocean Products was moving to Dover.

Q So you went to Shoreline Products. What type of business was that?
A That is the same thing as Ocean Products. It is a seafood place.
Q What were your duties there ?
A I packed shrimp there.
Q How long had you been working at Shoreline before this accident occurred ?
A It lacked about 12 weeks being a year.
Q I see. What were your normal workdays — number of days per week, and hours, at Shoreline ?
A We worked 9 hours, or sometimes 10, and we worked 6 days a week.
Q And had that been since you started with Shoreline, is that your normal work week there?
A Yes.
Q Now, when you worked with Ocean Products, what was their work schedule as far as hours is concerned ?
‡ ‡ % Jj« >jc jfc
A We worked 10 hours. That was practically every week, for 6 days a week.
Q So, both types of jobs were a 6 day a week job?
A Yes.
Q Now, Mary what were you earning an hour at Shoreline Shrimp Company?
A A dollar twenty-five cents an hour.
Q You had been earning that for how long?
A Since I went to work there. That is what they paid.
*260 What was your take-home pay; that is, what was in your hand each week when you drew your paycheck from Shoreline ? at
Fifty-two to fifty-nine dollars.
That was your take-home pay? a
Yes. <
It varies between fifty-two and fifty-nine, and that depends on the number of hours you would work? a
A Yes.”
As to plaintiff’s employment subsequent to the accident and resulting injuries involved herein, she testified as follows:
“Q (Interrupting) Before you get into that, did you try to go back to — is it Shoreline Shrimp?
A Yes, I did.
Q That is where you were working before the accident?
A I went there and tried to work and do the work.
Q Is that after Dr. Schroeder told you to go to work?
A Yes.
Q How long did you stay there ?
A I worked there 4 hours and that is all I could stand. I started, and that is all I could stand. I had to lift the boxes and put them on the assembly line, and it bothered me to move.
Q Did you have to leave that job?
A Yes.
Q Did you try to find other employment?
A From there I went to several places. I went to Buffer Brothers.
Q Do you mean Biff Burger?
A Yes. Where they make sandwiches, and to Lerner’s and Grant’s, and went to the Kinney’s Shoe Store.
Q Did they want any help?
A No, not right then, they weren’t hiring.
Q When did you find a job?
A The first of September.
Q Where?
A At Spotless Cleaners.
Q What type of job do you have there?
A I press clothes, and it is done by an automatic machine and it is very easy. It is pushbutton.
Q What do you mean — do you push a button for the machine ?
A Yes, and it bothers me up here (indicating). I have to take the clothes and hang them up, and it bothers me in here (indicating) after I have been working about three or four hours.
Q But you can do this work?
A But I still have problems when I do that. It hurts in here (indicating) very much.
Q Does it affect your low back very much?
A Yes, inhere (indicating).
Q Now, how many hours do you work at Spotless Cleaners ?
A I go to work at 8:00 and I get off at 2:30.'
Q And what do you make an hour there ?
A A dollar an hour.
Q Since you’re going to work at Spotless Cleaners, have you missed any days from there as a result of these *261 problems that you have described from this accident?
A Five days. We worked there one time for three days, 8 hours a day, and I had to go home. I couldn’t come back in because we worked for eight hours them three days and I had to stay out because I was hurting bad in my neck and back.
I wasn’t able to go on after I had worked them three 8 hour days.
Q So, after three straight days of 8 hours, you had to miss some time ?
A Yes.”
We, therefore, affirm the trial judge’s order granting a new trial on the issue of damages only. We also hasten to emphasize that if the testimony as outlined above is substantially the same in the new trial, the trial court should instruct the jury on plaintiff’s loss of earning capacity.
LILES, C. J., and ALLEN, J., concur.